`ATTORNEYS FOR APPELLANTS
Todd J. Kaiser
John K. Henning
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Karl L. Mulvaney
Brian W. Welch
Phil L. Isenbarger
Indianapolis, Indiana



## In the
## Indiana Supreme Court

No. 49S02-1203-CT-137

NATIONAL WINE & SPIRITS, INC.,
NATIONAL WINE & SPIRITS CORPORATION,
NWS, INC., NWS MICHIGAN, INC., AND
NWS, LLC,

*Appellants (Plaintiffs below),*

v.

ERNST & YOUNG, LLP,

*Appellee (Defendant below).*

Appeal from the Marion Superior Court, No. 49D10-0606-CT-22460
The Honorable David J. Dreyer, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 49A02-1012-CT-1289

**October 23, 2012**

**David, Justice.**

In this case, a company hired an accounting firm to provide auditing services. Their agreement provided that any claim arising from the services would be submitted to arbitration.

During the years covered by the agreement, an employee of the company committed fraud and theft, causing significant losses to the company.

The company alleged negligence, breach of contract, and unjust enrichment against the accounting firm and demanded arbitration. The arbitration panel ultimately found the accounting firm negligent and the company comparatively negligent. The company then filed the present suit, claiming the accounting firm committed deception because the documents that the accounting firm produced during the arbitration were misleading and caused the arbitration panel to find the company comparatively at fault.

We hold that, under the facts of this case, the issue underlying the deception claim is the veracity of the documents produced at arbitration, which was an issue necessarily decided by the arbitration panel. Accordingly, issue preclusion bars the company's deception claim, and we affirm the trial court's grant of summary judgment in favor of the accounting firm.

### Facts and Procedural History

In 1998, National Wine and Spirits (NWS) hired Ernst & Young (E&Y) to perform auditing services for NWS's fiscal years 1998 through 2001. NWS and E&Y agreed that "[a]ny claim or controversy arising out of or relating to the services covered by" the auditing agreement "shall be submitted . . . to binding arbitration."

During the fiscal years covered by the auditing agreement, an employee in NWS's accounts-receivable department, Diane Woodrum, committed fraud and theft and caused approximately $4.2 million in losses to NWS. In late 2001, NWS filed a complaint in trial court, asserting claims of negligence, breach of contract, and unjust enrichment against E&Y. E&Y responded with a motion to compel arbitration and stay proceedings, which the trial court granted. Accordingly, in 2002, NWS filed a demand for arbitration, asserting the same claims against E&Y as those asserted to the trial court.

Approximately seven months before arbitration, E&Y produced about 40,000 pages of documents from its audits of NWS. Among the documents was a memo by E&Y auditor David Sems ("Sems Memo"). The Sems Memo was written after the discovery of Woodrum's fraudulent activity and references the audit team's contacts with Woodrum: "There were several

2

incidences where questions where [sic] raised and the audit team contacted Ms. Woodrum for answers and explanations. These explanations are recorded in the audit work papers."

Just ten days before the arbitration hearing, E&Y produced additional computer records called "cell notes" that the previously produced documents did not contain. According to E&Y, the copier service had inadvertently failed to print the documents with the cell notes, which were additional remarks about the figures contained in the main body of the documents. Given the timing of the cell-notes disclosure, the arbitration-panel chairman asked NWS's counsel whether NWS was prepared to proceed or whether NWS wanted more time. NWS's counsel stated NWS wanted to proceed.

The cell notes indicated that E&Y had spoken with NWS employees Matt Albrecht and Cindy Sullivan about suspicious increases in accounts receivable. E&Y used the cell notes at arbitration as evidence that NWS was guilty of comparative fault. NWS presented evidence to refute the information contained in the cell notes. In particular, Albrecht and Sullivan testified that they never talked to anyone from E&Y, and Albrecht, Sullivan, and other NWS employees testified that information contained in the cell notes was inaccurate.

The arbitration panel concluded that E&Y was negligent and that NWS was comparatively negligent and responsible for 40% of its own losses. Accordingly, the panel ordered E&Y to pay NWS 60% of its losses, which amounted to approximately $2.25 million. E&Y sent NWS a check for that amount, and the parties entered a joint stipulation for dismissal of the court case with prejudice. In September 2004, the trial court dismissed the case with prejudice.

Less than two years later, NWS sued E&Y for fraud and deception in connection with the records E&Y produced and relied upon during arbitration. The complaint alleged several theories of deception: (1) E&Y may have altered the cell notes once litigation began to make it appear that E&Y auditors did not act negligently; (2) E&Y auditors may have entered false information initially that would incorrectly cause a finder of fact to determine E&Y acted properly, and E&Y intentionally produced the false cell notes in the arbitration proceedings; and (3) E&Y scrubbed the work papers of incriminating documents, and E&Y intentionally produced them in this misleading form during the arbitration proceedings. E&Y moved for summary

3

judgment, and the trial court granted E&Y summary judgment on NWS's fraud claim but denied the motion as to the deception claim. E&Y then filed a second motion for summary judgment on NWS's deception claim, producing an expert's opinion that the cell notes were not altered after they were created. The trial court granted E&Y's second motion for summary judgment.

On appeal, NWS contended that, as a threshold matter, the trial court should have dismissed E&Y's second summary judgment motion as an "improper" successive motion. Nat'l Wine & Spirits, Inc. v. Ernst & Young, LLP, 954 N.E.2d 1017, 1020 (Ind. Ct. App. 2011). NWS further contended that the trial court should have denied the motion because a material issue of fact existed regarding its second and third theories of deception. Id. The Court of Appeals rejected NWS's threshold argument, but it concluded that the evidence does allow an inference in favor of NWS on its second and third theories of deception and, accordingly, summary judgment was improper. Id. at 1020–22. In reaching this conclusion, the Court of Appeals rejected E&Y's alternative arguments that NWS's allegations do not give rise to theories of deception and that res judicata bars NWS's claims. Id. at 1021–23.

We granted transfer. We summarily affirm the decision of the Court of Appeals that E&Y's successive motion for summary judgment was proper. Ind. Appellate Rule 58(A)(2).

## Standard of Review

In reviewing summary judgment, this Court applies the same standard as the trial court: summary judgment is proper when the moving party demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). If the trial court's summary judgment can be sustained on any basis in the record, we affirm. Harris v. Traini, 759 N.E.2d 215, 221 (Ind. Ct. App. 2001), trans. denied.

## Issue Preclusion

E&Y contends that both components of res judicata—issue preclusion and claim preclusion—preclude NWS's deception claim and support summary judgment in E&Y's favor. E&Y argues that the matter NWS now seeks to litigate either was decided or could have been decided in the arbitration proceeding. Specifically, E&Y maintains that NWS simply "seeks to

4

use a deception claim to overturn the arbitration panel's decision to attribute 40% comparative fault to it."

We agree with E&Y that, under these circumstances, issue preclusion bars NWS's deception claim. Accordingly, we need not address whether claim preclusion also applies.[1]

Issue preclusion, or collateral estoppel, bars subsequent relitigation of the same fact or issue where that fact or issue was necessarily adjudicated in a former lawsuit and that same fact or issue is presented in a subsequent suit. Hayworth v. Schilli Leasing, Inc., 669 N.E.2d 165, 167 (Ind. 1996). This rule applies even if the second adjudication is on a different claim. Tofany v. NBS Imaging Sys., Inc., 616 N.E.2d 1034, 1037 (Ind. 1993).

The present scenario involves defensive collateral estoppel, as E&Y, the defendant, seeks to prevent NWS, the plaintiff, from relitigating an issue that NWS has already litigated and lost in the arbitration proceeding. See Small v. Centocor, Inc., 731 N.E.2d 22, 28 (Ind. Ct. App. 2000), trans. denied. There are three requirements for the doctrine of collateral estoppel to apply: (1) a final judgment on the merits in a court of competent jurisdiction; (2) identity of the issues; and (3) the party to be estopped was a party or the privity of a party in the prior action. Id. Furthermore, two additional considerations are relevant in deciding whether the defensive use of collateral estoppel is appropriate: "whether the party against whom the judgment is pled had a full and fair opportunity to litigate the issue, and whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel." Id. Because there is no dispute that the parties to the current action are the same as those involved in the arbitration, we need not address that requirement.

A. *Final Judgment on the Merits*

Issues determined in arbitration are binding and conclusive and may bar relitigation of those issues. Brougher Agency, Inc. v. United Home Life Ins. Co., 622 N.E.2d 1013, 1016 (Ind. Ct. App. 1993). In essence, a final judgment or award resulting from an arbitration proceeding is accorded the same force of res judicata as a judgment of a court. See id.

---

[1] E&Y raises a number of other arguments on transfer supporting its summary judgment motion. Because of our disposition in this case, we need not address those additional arguments.

NWS does not question this general rule, and NWS further concedes that "[t]here is no dispute that the arbitrators ruled on NWS's negligence claims, that the arbitrators issued an award based on the negligence findings, that E&Y paid the arbitration award, or that NWS accepted the award." NWS argues, however, that there is no final judgment on the merits because "E&Y never confirmed the arbitrator's award in accordance with Indiana law." NWS cites Indiana Code sections 34-57-1-20 (2008),[2] 34-57-2-12,[3] and 34-57-2-16[4] in support of its argument. NWS also cites two cases to support its contention: Gayheart v. Newnam Foundry Co., 271 Ind. 422, 393 N.E.2d 163 (1979), and Fruehauf Corp. v. Review Board of the Indiana Employment Security Division, 148 Ind. App. 627, 269 N.E.2d 184 (1971).

In response, E&Y states that the fact that an arbitration award has not been confirmed has no impact on collateral-estoppel analysis. E&Y cites several federal decisions in support. E.g., Stulberg v. Intermedics Orthopedics, Inc., 997 F. Supp. 1060, 1067–68 (N.D. Ill. 1998) (noting that "other courts have given preclusive effect to unconfirmed arbitration awards where contractual or state law rights are at issue").

After reviewing the statutes and cases that NWS cites in support of its argument, we find that they do not stand for the proposition that an award must be confirmed to have preclusive

---

[2] Indiana Code section 34-57-1-20 states in full,

> If the award is confirmed, judgment shall be given in favor of any party to whom any sum of money or damages has been awarded that the party recover the amount awarded. If the award orders any act to be done by either party; judgment shall be entered that the act be done according to the award.

[3] Indiana Code section 34-57-2-12 states in full,

> Upon application of a party, but not before ninety (90) days after the mailing of a copy of the award to the parties, the court shall confirm an award, unless within the time limits hereinafter imposed grounds are urged for vacating or modifying or correcting the award, in which case the court shall proceed as provided in sections 13 and 14 of this chapter. Upon confirmation, the court shall enter a judgment consistent with the award and cause such entry to be docketed as if rendered in an action in the court.

[4] Indiana Code section 34-57-2-16 states in full,

> Except as otherwise provided, an application to the court under this chapter shall be by motion and shall be heard in the manner and upon the notice provided by law or rule of court for the making and hearing of motions. Unless the parties have agreed otherwise, notice of an initial application for an order shall be served in the manner provided by law for the service of a summons in civil cases.

effect. Confirmation is a purely procedural mechanism by which a court converts an arbitration award into a judgment for enforcement purposes. However, "[t]he reality is that confirmation is not necessary in the vast majority of cases." Susan Wiens & Roger Haydock, Confirming Arbitration Awards: Taking the Mystery Out of a Summary Proceeding, 33 Wm. Mitchell L. Rev. 1293, 1295 (2007). This is because "[l]osing parties commonly abide by the arbitration award and pay what they owe or otherwise comply with the decision." Id.

The arbitration agreement here provided that NWS and E&Y would submit their disputes arising out of the auditing services to arbitration, the result of which would be "binding" on all parties. The arbitrators' final resolution of the issues presented at arbitration was an award to NWS, which E&Y paid to NWS. To not afford preclusive effect to this final determination on the merits solely because the award was unconfirmed would be unsound and at odds with the purposes that underlie the doctrine of res judicata. Accordingly, we agree with E&Y that, under these circumstances, "collateral estoppel appl[ies] to issues resolved by arbitration 'where there has been a final determination on the merits, notwithstanding a lack of confirmation of the award.'" Jacobson v. Fireman's Fund Ins. Co., 111 F.3d 261, 267–68 (2d. Cir. 1997) (citing Hilowitz v. Hilowitz, 444 N.Y.S.2d 948, 949 (N.Y. App. Div. 1981)). Thus, the first requirement of issue preclusion is satisfied.

B. *Identity of the Issues*

The "identity of the issues" requirement of the collateral-estoppel doctrine is met when an issue that was necessarily adjudicated in the prior proceeding is the same issue presented in the subsequent lawsuit. Afolabi v. Atl. Mortg. & Inv. Corp., 849 N.E.2d 1170, 1175 (Ind. Ct. App. 2006). The requirement is not met, however, if the issue is one that was not actually litigated and determined but only one that might have been litigated and determined. Id.

NWS offers two reasons why that this requirement of collateral estoppel was not met: (1) because NWS was prohibited from raising the current deception claim[5] in the prior arbitration

---

[5] A person who "knowingly or intentionally makes a false or misleading written statement with intent to obtain property, employment, or an educational opportunity" commits deception. I.C. § 35-43-5-3(a)(2) (2008). NWS's deception claim is based on the deception statute and Indiana Code section 34-24-3-1 (Supp. 2012), which gives statutory authority for civil actions based upon crimes committed under Indiana Code article 35-43.

action and (2) because the arbitration panel did not specifically decide the veracity of the cell notes and work papers in question. We address each argument in turn.

NWS contends that collateral estoppel cannot apply to a matter that could not have been adjudicated in the prior proceeding. NWS explains that the deception claim was outside the scope of the arbitration agreement and, thus, outside the scope of the arbitrators' authority. The arbitration agreement provided that "[a]ny controversy or claim arising out of or relating to the services covered by this letter or hereafter provided . . . shall be submitted . . . to binding arbitration." NWS acknowledges that any claim arising out of or relating to E&Y's audit services provided to NWS would fall under the agreement. NWS argues, however, that "the deception claim does not 'arise out of or relate to' E&Y's services covered by the arbitration agreement." Essentially, NWS claims that the actions giving rise to the deception claim— namely, the production of the cell notes and work papers at arbitration—took place after the auditing services had completed and the relationship between NWS and E&Y had terminated. In response, E&Y notes that the issue underlying NWS's deception claim is the veracity of the cell notes and work papers and that an argument regarding the veracity of the documents created during the audits is clearly within the scope of the arbitration clause.

This Court has described a similar arbitration clause as having "all-encompassing language." PSI Energy, Inc. v. AMAX, Inc., 644 N.E.2d 96, 100 (Ind. 1994) (evaluating the clause "any controversy [or] claim . . . arising out of or relating to this Agreement or breach thereof shall be settled by arbitration"). Furthermore, in construing arbitration agreements, "every doubt is to be resolved in favor of arbitration, and the parties are bound to arbitrate all matters, not explicitly excluded, that reasonably fit within the language used." Mislenkov v. Accurate Metal Detinning, Inc., 743 N.E.2d 286, 289 (Ind. Ct. App. 2001) (internal quotation marks omitted) (quoting Ziegler v. Whale Sec. Co., 786 F. Supp. 739, 741 (N.D. Ind. 1992)).

Here, NWS claims deception based on either falsified or scrubbed work documents that E&Y produced for the arbitration proceeding. It would defy logic to say that this issue falls outside the scope of the broad arbitration clause, as the documents certainly arise out of or relate to the audit services that E&Y provided for NWS. NWS focuses attention on the fact that the alleged deception occurred once the documents were produced at arbitration, as opposed to when

8

they were created. But NWS, as evidenced by its second argument below, recognizes that the issue underlying its deception claim is the veracity of the allegedly falsified or scrubbed documents. And we cannot see how the documents at issue, which all directly discuss the audit, do not relate to or arise out of the auditing services. Thus, this issue falls within the scope of the arbitration agreement.

This brings us to NWS's next argument—that the arbitration panel did not specifically determine the veracity of the cell notes or work papers at issue and thus the "identity of the issues" requirement was not met. NWS argues that because the arbitration award did not make findings concerning the weight afforded to the documents in question, it is left to conjecture whether the panel determined the documents' veracity. E&Y responds that the "entire premise" of NWS's case has been that the arbitrators placed great emphasis on the content of the cell notes and work papers in apportioning 40% of the fault to NWS.

In its brief on appeal, NWS consistently mentions the documents in question as having an effect on the panel's apportionment of comparative fault. For example, NWS frames one of its allegations against E&Y as "deception by . . . using false statements in the A/R workpapers and cell notes to establish NWS's comparative fault." NWS cannot argue that the panel did not decide the veracity of the documents and then also claim that the reason the panel decided NWS was comparatively at fault was because the documents E&Y produced were falsified or scrubbed. In other words, NWS claims that the documents in question were responsible for the panel's determination of comparative fault against it, which necessarily means that NWS concedes that the panel found those allegedly deceptive documents to be truthful. Accordingly, NWS is attempting to relitigate an issue that was already decided—the veracity of the documents produced by E&Y at arbitration.

We find the present case similar to Prudential Securities Inc. v. Hornsby, 865 F. Supp. 447 (N.D. Ill. 1994), which involved a dispute between a securities broker and an investor. In that case, the securities broker sought to stop a second arbitration, where the claims arose from a prior arbitration in which the investor had obtained an award against the securities broker. Prudential, 865 F. Supp. at 448. In its second arbitration claim, the investor asserted, among other things, that the securities broker "fraudulently" concealed internal memoranda during the

first arbitration proceeding and that his first arbitration award would have been higher had the arbitrators known of the memoranda. Id. at 448–49. The district court found that the investor's "attempt to arbitrate an 'independent' fraud claim against [the securities broker] is, in reality, an attempt to augment and modify the first arbitration award." Id. at 451. In other words, the court found that the second arbitration was simply an attempt by the investor to obtain the amount he would have received in the first arbitration but for the security broker's fraudulent conduct. Id. at 452. Notably, the court cited a case that rejected an attempt to characterize a subsequent claim as independent based on the types of damages sought. Id. at 450; see, e.g., Corey v. N.Y. Stock Exch., 691 F.2d 1205, 1213 (6th Cir. 1982) ("Corey's claims constitute a collateral attack against the award even though Corey is presently . . . requesting damages for the acts of wrongdoing rather than the vacation, modification or correction of the arbitration award."). NWS attempts to distinguish Prudential by stating that its deception claims are not covered by the arbitration agreement. But, as discussed above, we have found otherwise. Accordingly, for the foregoing reasons, we find that the "identity of issues" requirement of the collateral-estoppel doctrine is met.

## C. *Full and Fair Opportunity to Litigate the Issue*

An important consideration to determine whether application of collateral estoppel is proper is "whether the party against whom the judgment is pled had a full and fair opportunity to litigate the issue." Hayworth, 669 N.E.2d at 167. In discussing this requirement, this Court has stated that defensive collateral estoppel, when compared to offensive collateral estoppel, "is more likely to promote judicial economy." Id. at 168.

Here, NWS states it did not have a full and fair opportunity to litigate the issue because it did not have an opportunity to conduct discovery into the claims. NWS premises its argument on the following clause in the arbitration agreement: "No discovery will be permitted in connection with the arbitration unless it is expressly authorized by the arbitration panel upon a showing of substantial need by the party seeking discovery."

E&Y responds that both parties here agreed to arbitration procedures that limited discovery, and this limitation on discovery is routine in arbitration agreements and should not be viewed negatively.

10

As we stated earlier, the issue NWS is currently attempting to litigate—the veracity of the documents—was covered by the arbitration agreement. Although the arbitration agreement limited discovery to that which is expressly authorized by the panel, NWS never asked the panel for additional discovery. In fact, even though the cell notes were produced just ten days before arbitration, NWS's counsel stated that he wanted to proceed. After finding out the timing of the disclosure of the cell notes, the panel chair stated to NWS's counsel, "So you haven't had a tremendous amount of time to look at those. I do want to make sure you feel like you want to proceed anyway." NWS's counsel stated, "Yes, we do. We want to proceed."

Ultimately, the transcript of the arbitration proceeding suggests that the panel would have given NWS more time to inspect the cell notes that were produced late. NWS cannot now complain that it did not have a fair and full opportunity to litigate the issue of the veracity of the documents when it chose to proceed despite being given an opportunity to postpone the start of the arbitration. NWS could have asked for a continuance. It chose instead to proceed. Thus, we find that NWS had a full and fair opportunity to litigate the issue of the veracity of the documents in question.

D. *Fairness of Collateral Estoppel*

A final consideration is "whether it would be otherwise unfair under the circumstances of the particular case to apply collateral estoppel." Id. at 167. NWS argues that the application of collateral estoppel is unfair because "E&Y proposes to hold the efforts of NWS during an arbitration for which NWS could not adequately prepare against it when litigating a separate and distinct claim of deception."

Although the claim is one of deception, the issue at the heart of the deception claim is the veracity of the documents, which NWS itself states resulted in the panel's comparative-fault determination against it. And, as explained above, NWS cannot now complain it could not adequately prepare to litigate that issue when given the opportunity to postpone the arbitration.

**Conclusion**

Collateral estoppel precludes NWS's deception claim because the issue underlying that claim—the veracity of E&Y's documents—was already decided during the arbitration

11

proceedings.  Accordingly, on that basis, we affirm the trial court's grant of summary judgment in E&Y's favor.


Dickson, C.J., and Rucker and Massa, JJ., concur.