


FILED

Jun 29 2023, 2:58 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Indiana Supreme Court

Supreme Court Case No. 22S-CT-371

## Zachary Miller,
*Appellant (Plaintiff below),*

−v−

## Laxeshkumar Patel, M.D.; John Schiltz, M.D.; Benjamin Coplan, M.D.; Community Physicians of Indiana, Inc.; and Community Howard Regional Health, Inc., d/b/a Community Howard Behavioral Health,
*Appellees (Defendants below).*

Argued: December 15, 2022 | Decided: June 29, 2023

**Corrected**

Appeal from the Howard Superior Court
No. 34D01-1903-CT-651
The Honorable William C. Menges, Jr., Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 21A-CT-2500

**Opinion by Justice Massa**
Justices Slaughter and Molter concur.
Chief Justice Rush concurs in part and dissents in part with separate opinion
in which Justice Goff joins.

**Massa, Justice.**

The decisive question presented is whether convictions entered after a guilty plea have the same preclusive effect in subsequent litigation as those entered after jury or court verdicts. Here, the Appellant Zachary Miller pleaded guilty but mentally ill to voluntary manslaughter, then sued his mental health providers in essence for not preventing his crime. The trial court entered summary judgment for the Providers, but the Court of Appeals endorsed Miller's ambitious request to relitigate his mens rea by relying on authority from a neighboring state, and reversed. We affirm the trial court and hold in a matter of first impression that in Indiana, guilty pleas have the same preclusive effect as trial verdicts, and Miller thus is collaterally estopped from relitigating his legal responsibility—an issue that was necessarily settled by his plea.

## Facts and Procedural History

We return for round three of civil appeals arising from Miller's killing of his grandfather. Starting with *Miller v. Patel*, 174 N.E.3d 1061 (Ind. 2021) ("*Miller I*"), this Court held that the federal Emergency Medical Treatment and Labor Act's (EMTALA) statute of limitations did not preempt a state rule allowing for amendments relating back to the original pleading, *id.* at 1067, which allowed Betty Miller, the decedent's widow, to amend her complaint to add an otherwise time-barred EMTALA claim if it could be shown that it arose from the same conduct set forth in the original complaint. *Id.* at 1066. Next, in *Coplan v. Miller*, 179 N.E.3d 1006 (Ind. Ct. App. 2021), *trans. denied* ("*Miller II*"), the Court of Appeals, in reviewing another claim brought by Betty Miller, affirmed the denial of defendants' motion for summary judgment under two statutory provisions that immunize mental health providers for failing to warn or take precautions to protect others from a patient's violent behavior. *Id.* at 1008–09.

Finally, in this action, Miller himself seeks damages from those who provided him mental health treatment—Dr. Patel, Dr. Schiltz, Dr. Coplan, Community Physicians of Indiana, Inc., and Community Howard Regional Health, Inc., d/b/a Community Behavioral Health (collectively,

"Providers")—prior to the murder. On March 16, 2018, while his criminal prosecution was pending, Miller filed a proposed complaint for damages with the Indiana Department of Insurance ("IDOI"), alleging that Providers' care and treatment of him "failed to comply with the applicable standards of care." Appellant's App. Vol. II, pp. 18–24. Miller also asserted that "as a direct and proximate result" of Providers' failure, he "suffered and will continue to suffer from permanent injuries and disabilities, great pain, emotional distress, mental trauma and loss of freedom." *Id.* He also added a claim for negligent infliction of emotional distress. During the IDOI proceedings, Providers served Miller with interrogatories. Miller responded to them, and explained that, because of Providers' negligent conduct, he "killed his grandma's dog and killed his grandfather," and was incarcerated for murder charges. *Id.* at 27. He also stated that Providers caused injury to him by failing to admit him to the hospital, and if he had been admitted, his "grandma's dog" and "grandfather would be alive" and he would not be in jail. *Id.* at 28. On March 3, 2019, Miller filed an anonymous complaint for damages with the trial court.

On August 21, 2020, Miller pleaded "guilty but mentally ill" to voluntary manslaughter. *Id.* at 14–15. He was later sentenced to the Indiana Department of Corrections for twenty years, twelve executed.

In December 2020, the Indiana Medical Review Board determined that "[t]he evidence supports the conclusion that the Defendants failed to comply with the appropriate standard of care as charged in the complaint, and the conduct complained of was a factor of the resultant damages." *Id.* at 120. Soon after, Miller filed a motion for leave to amend the complaint in the trial court to identify the previously anonymous Providers. In his second amended complaint, Miller advanced the same allegations in his original complaint with IDOI.

Providers moved for summary judgment under Indiana Trial Rule 56(C), arguing that Miller's alleged damages were not compensable under Indiana public policy, and that Miller was collaterally estopped from relitigating his responsibility for the crime. Miller responded with various exhibits, including an unsworn medical statement by Dr. Frank Krause, who stated that Miller was found to be "insane" on the date of the assault

under Indiana Code Section 35-41-3-6. Appellant's App. Vol. II, p. 59. Providers moved to strike Miller's Trial Rule 56 exhibits. Following a hearing, the trial court granted Providers' motion for summary judgment, and denied their motion to strike. Miller appealed, arguing he "should be allowed . . . to rebut the prima facie case and prove he was insane at the time of the assault," and that "he did not commit an intentional act[.]"Appellant's Br. at 32. In response, Providers pressed their same public policy and collateral estoppel arguments, while also adding that Miller's appellate brief suffered from a number of Appellate Rule 46 defects, and thus certain issues were waived. Miller did not file a reply.

In a unanimous published opinion, the Court of Appeals reversed and remanded. *Miller v. Patel*, 189 N.E.3d 216 (Ind. Ct. App. 2022), *vacated*. The panel found that Providers failed to establish there were no genuine issues of material fact warranting summary judgment because it was "unclear" whether Miller was legally responsible for his act. *Id.* at 221. The panel endorsed the public policy accepted by the Court of Appeals in *Rimert v. Mortell*, 680 N.E.2d 867 (Ind. Ct. App. 1997), *trans. denied*, which prescribes that "a person cannot maintain an action if, in order to establish the cause of action, he must rely, in whole or in part, on an illegal or immoral act or transaction to which he is a party," or "on a violation by himself of the criminal or penal laws[.]" *Id.* at 871–72. But in acknowledging *Rimert*, the panel also identified "an important limitation" within that policy: "the extent that a plaintiff was not responsible for the underlying criminal act, [such as] by reason of insanity." *Miller*, 189 N.E.2d at 221 (citing *Rimert*, 680 N.E.2d at 874–75). The panel also found that collateral estoppel did not bar Miller's action because the issue of whether he was criminally insane when he killed his grandfather was not fully and fairly litigated when he entered his plea agreement. *See Miller*, 189 N.E.3d at 226. The panel relied on a Supreme Court of Illinois opinion, *Talarico v. Dunlap*, 685 N.E.2d 325 (Ill. 1997), for the proposition that collateral estoppel is a "flexible doctrine" that must be assessed case-by-case, and that prior criminal charges did not necessarily preclude relitigation of responsibility. *Miller*, 189 N.E.3d at 223 (quoting *Talarico*, 685 N.E.2d at 329–30).

Providers sought transfer, which we granted, thus vacating the Court of Appeals' opinion. Ind. Appellate Rule 58(A). Miller did **not** file a brief before this Court responding to Providers' petition for transfer.

# Standard of Review

"We review summary judgment decisions de novo, applying the same standard as the trial court." *624 Broadway, LLC v. Gary Hous. Auth.*, 193 N.E.3d 381, 384 (Ind. 2022). Summary judgment is proper only "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). In reviewing these motions, we "draw all reasonable inferences in the non-moving party's favor." *Serv. Steel Warehouse Co., L.P. v. U.S. Steel Corp.*, 182 N.E.3d 840, 842 (Ind. 2022).

# Discussion and Decision

## I. Providers are entitled to summary judgment with respect to Miller's damages that stem, "in whole or in part," from his criminal act.

To begin, we acknowledge that Miller and Providers assume the "wrongful acts" doctrine embraced by the Indiana Court of Appeals in *Rimert v. Mortell*, 680 N.E.2d 867 (Ind. Ct. App. 1997), *trans. denied*, applies. Under that doctrine, "a person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an illegal or immoral act." *Id.* at 871–72. This principle is a rational policy expression "that those who knowingly and intentionally engage in serious illegal acts should not be able to impose liability upon others for the consequences of their own behavior." *Id.* at 872. Other state jurisdictions have used this rule to bar actions seeking damages because of the injured party's

"knowing and intentional participation in a criminal act." *Id.* But even in those jurisdictions, there is subtle nuance in its application.[1]

The wrongful acts doctrine has never been formally adopted by this Court. Here, the parties all but assume the doctrine exists without first framing whether this Court should adopt it as a matter of Indiana public policy. And so, because neither party briefed this threshold question, we decline to ratify the doctrine today. To be clear about this unique posture: we do not prejudge the merits of the doctrine in future cases. Instead, in this case we only narrowly **assume without deciding** whether the doctrine applies in Indiana. From that premise, Providers are thus entitled to summary judgment on Miller's alleged damages that stem, "in whole or in part," from his criminal conduct. *Id.* at 871–72. But any alleged damages for which Miller need not rely on his criminal act to state a claim may be otherwise compensable because such actions would fall outside the reach of the doctrine. *See Beal v. Blinn*, 9 N.E.3d 694, 701 (Ind. Ct. App. 2014) (distinguishing *Rimert* to find that plaintiff can recover damages from their attorney for malpractice acts unconnected to the criminal act). Here, however, we need not reach the pre-criminal act damages issue because it is **waived**. *See Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015) ("A litigant

---

[1] *See, e.g., Orzel by Orzel v. Scott Drug Co.*, 537 N.W.2d 208, 214 (Mich. 1995) (adopting the rule, but requiring "the plaintiff's conduct must be prohibited or almost entirely prohibited under a penal or criminal statute"); *Poch v. Anderson*, 580 N.W.2d 456, 458 (Mich. Ct. App. 1998) (excepting from the rule circumstances in which "the defendant's culpability for the damages is greater than the plaintiff's culpability"); *Rosenick v. Cham*, No. 214298, 2001 WL 776737, at *2 (Mich. Ct. App. Jan. 16, 2001) (refusing to apply the rule if the plaintiff's "cause of action can be established without relying on his illegal act"); *Oden v. Pepsi Cola Bottling Co. of Decatur, Inc.*, 621 So.2d 953, 955 (Ala. 1993) (applying the rule "to bar any action seeking damages based on injuries that were a direct result of the injured party's knowing and intentional participation in a crime involving moral turpitude"); *Ardinger v. Hummell*, 982 P.2d 727, 736 (Alaska 1999) (finding the statutory offense of driving a car without the owner's permission "does not represent the level of serious criminal conduct generally necessary to bar recovery" and the plaintiff's harm was not the type of risk the statute was designed to prevent); *Barker v. Kallash*, 468 N.E.2d 39, 41 (N.Y. 1984) (distinguishing "between lawful activities regulated by statute and activities which are entirely prohibited by law[,]" because New York's public policy "generally denies judicial relief to those injured in the course of committing a serious criminal act"); *Wackwitz v. Roy*, 418 S.E.2d 861, 864–65 (Va. 1992) (recognizing that a person who consents to and participates in an immoral or illegal act may not recover damages, but refusing to apply this rule where a defendant committed suicide with an unsound mind).

who fails to support his arguments with appropriate citations to legal authority and record evidence waives those arguments for our review.").

Today, we evaluate a single controlling issue: whether guilty pleas are afforded the same preclusive effect as trial convictions. We review this novel issue with fresh eyes as a matter of first impression.

## II. Miller is estopped from relitigating his legal responsibility under defensive issue preclusion.

In Indiana, a felony conviction may supply a basis for collateral estoppel—barring the litigation of issues and facts necessarily adjudicated in a prior action. *Kimberlin v. DeLong*, 637 N.E.2d 121, 124–25 (Ind. 1994); *Meridian Ins. Co. v. Zepeda*, 734 N.E.2d 1126, 1131 (Ind. Ct. App. 2000), *trans. denied*. A conviction has also been admissible evidence in a civil action, but not "necessarily conclusive proof" of the facts on which the criminal conviction was based. *Id.* at 124. Today, we hold that entered guilty pleas are subject to the same preclusive reach as trial convictions.

But before doing so, we review Indiana's relevant preclusion doctrine. Traditionally, we have followed the common law path of classifying **res judicata** and **collateral estoppel**—also referred as **claim preclusion** and **issue preclusion**—as two types of preclusion that "are not separate branches but separate trees." *Matter of Eq.W.*, 124 N.E.3d 1201, 1216 (Ind. 2019) (Slaughter, J., concurring). In practice, both trees exist to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *United States v. Mendoza*, 464 U.S. 154, 158 (1984) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). Even so, these doctrines contain meaningful distinctions in their shape and form. We explore each one in turn.

Starting with **claim preclusion**: this doctrine serves a broader role as a complete and categorical "bar to subsequent litigation on the same claim between identical parties." *Edwards v. Edwards*, 132 N.E.3d 391, 396 (Ind. Ct. App. 2019). Underlying claim preclusion are four requirements that must be satisfied: "(1) the former judgment must have been rendered by a

court of competent jurisdiction; (2) the former judgment must have been rendered on the merits; (3) the matter now in issue was, or could have been, determined in the prior action; and (4) the controversy adjudicated in the former action must have been between the parties to the present suit or their privies." *Afolabi v. Atl. Mortg. & Inv. Corp.*, 849 N.E.2d 1170, 1173 (Ind. Ct. App. 2006). Uniquely, claim preclusion is asserted only from a **defensive** posture. That is, the doctrine may only be invoked by a defendant who "seeks to prevent a plaintiff from asserting a claim that the plaintiff previously litigated and lost[.]" *Thrasher, Buschmann & Voekel, P.C. v. Adpoint Inc.*, 24 N.E.3d 487, 494 (Ind. Ct. App. 2015). Practically speaking, because offensive claim preclusion is a "nonexistent" form of res judicata, a plaintiff cannot turn around in a subsequent action and "reassert a claim that he has already won." *Robbins v. MED-1 Solutions, LLC* 13 F.4th 652, 657 (7th Cir. 2021). Where at play, claim preclusion enacts a robust and "powerful prohibition against claim splitting" because it extinguishes not only an entire claim or set of defenses, but any other possible "claims that could have been litigated." *Id.*

**Issue preclusion**, in contrast, is narrower and instead executes a more targeted purpose. For example, collateral estoppel forecloses any "subsequent re-litigation of the **same fact or issue** where that fact or issue was necessarily adjudicated in a former suit and the same fact or issue is presented in the subsequent lawsuit." *Tofany v. NBS Imaging Sys., Inc.*, 616 N.E.2d 1034, 1037 (Ind. 1993) (emphasis added). In these cases, "the first adjudication will be held conclusive even if the second is [constituted] on a different claim." *Tofany*, 616 N.E.2d at 1037 (citing *Sullivan v. American Cas. Co.*, 605 N.E.2d 134, 137 (Ind. 1992)). Three conditions lay the foundation for collateral estoppel: "(1) a final judgment on the merits in a court of competent jurisdiction; (2) identity of the issues; and (3) the party to be estopped was a party or the privity of a party in the prior action." *National Wine & Spirits, Inc. v. Ernst & Young, LLP* 976 N.E.2d 699, 704 (Ind. 2012), *cert. denied.*, 569 U.S. 1018 (2013). The second requirement will fail "if the issue is one that was **not actually litigated and determined**[.]" *Id.* (emphasis added). In deciding whether issue preclusion is appropriate, Indiana courts also examine two salient considerations—(a) "whether the party against whom the judgment is pled had a full and fair opportunity

to litigate the issue," and (b) "whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel." *Id.* (internal citation and quotation marks omitted). These twin considerations shape whether collateral estoppel is fitting in a case.

Traditionally, collateral estoppel in Indiana was anchored by a common law mutuality requirement. *See, e.g., Tobin v. McClellan*, 225 Ind. 335, 344–46, 73 N.E.2d 679, 683–84 (1947); *Dayton v. Fisher*, 34 Ind. 356, 358 (1870). Two distinct aspects defined this time-honored constraint: **one**, the "mutuality of estoppel," which is where "one taking advantage of the prior adjudication would have been subsequently bound had the prior judgment gone the other way." *State v. Spiedel*, 181 Ind. App. 448, 456, 392 N.E.2d 1172, 1177 (1979). And **two**, the "identity of the parties" restriction, where the "party to be bound by a prior adjudication must be the same as or in privity with the party in the prior action." *Tofany*, 616 N.E.2d at 1037 (citing *Spiedel*, 181 Ind. App. at 454, 392 N.E.2d at 1176). In light of this traditional common law backdrop, Indiana applied the "stranger to the judgment" rule, which precluded "one who is neither a party nor in privity with a party to the prior judgment . . . to take advantage of collateral estoppel in the subsequent action." *Id.* at 1037.

In 1971, the United States Supreme Court vitiated the mutuality requirement, *see Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 350 (1971), and later "broadened the scope of collateral estoppel beyond its common law limits." *Mendoza*, 464 U.S. at 158 (citing *Allen*, 449 U.S. at 94). The United States Supreme Court "conditionally" approved offensive collateral estoppel, *Mendoza*, 464 U.S. at 158, a move authorized by *Parklane Hosiery Company, Inc. v. Shore*, 439 U.S. 322, 331–33 (1979). In 1992, the Indiana Supreme Court followed course in *Sullivan v. American Casualty Company*, 605 N.E.2d at 137, and "dispensed with the rigid requirements of mutuality and identity of parties." *Id.* at 138. Today, collateral estoppel is analyzed by its **offensive** or **defensive** posture. *See Tofany*, 616 N.E.2d at 1037. In *Parklane Hosiery*, the United States Supreme Court concluded that both forms of collateral estoppel share a common core: "the party against whom estoppel is asserted has **litigated and lost** in an earlier action." 439 U.S. at 329 (emphasis added). So, unlike claim preclusion, which only allows a

defensive application in practice, issue preclusion can be used in **two ways**—defensively or offensively. *See Robbins*, 13 F.4th at 657.

Posture matters. Take offensive issue preclusion—the more discouraged form of collateral estoppel. In that setting, the later "plaintiff seeks to foreclose the defendant from litigating an issue the defendant had previously litigated unsuccessfully in an action with another party." *Tofany*, 616 N.E.2d at 1037 (quoting *Parklane Hosiery*, 439 U.S. at 326 n.4). This form of preclusion is disfavored for two key policy reasons: (1) judicial economy and (2) unfairness to the defendant. *Id.* at 1038 (citing *Parklane Hosiery*, 439 U.S. at 329–31). **One**, offensive issue preclusion creates a perverse "wait and see" incentive structure that invariably invites more litigation, and thus imposes greater costs on courts. *Parklane Hosiery*, 439 U.S. at 330. In these types of cases, a later plaintiff—one not bound by a judgment if the defendant wins—can rely on that **same** judgment if the defendant loses. *Id.* Under this "wait and see" regime, later plaintiffs would "have everything to gain and nothing to lose." *Id.*

And **two**, there is an increased specter of unfairness to defendants. *Parklane* described several scenarios where fairness might be jeopardized:

> (a) where the defendant had little incentive to vigorously litigate the first action either because the damages were small or nominal, or because future suits were not foreseeable;

> (b) where the judgment relied upon for estoppel is inconsistent with one or more previous judgments in which the defendant was successful; or

> (c) where procedural opportunities are available to the defendant in the latter action which were unavailable to him in the previous action and which would likely affect the result.

*Tofany*, 616 N.E.2d at 1038 (citing *Parklane Hosiery*, 439 U.S. at 330–31). Heeding *Parklane Hosiery*'s warning, Indiana subjected its use of offensive issue preclusion to *Parklane Hosiery*'s requirements. *See id.* at 1038. Indiana trial courts, however, still enjoy broad discretion to determine whether offensive issue preclusion "is fair and equitable in each case." *Id.* at 1039 (citing *McCullough v. Archbold Ladder Co.*, 605 N.E.2d 175, 180 (Ind. 1993)).

In contrast, **defensive** issue preclusion is viewed with less circumspection because it "is more likely to promote judicial economy." *National Wine & Spirits*, 976 N.E.2d at 708 (quoting *Hayworth v. Schilli Leasing, Inc.*, 669 N.E.2d 165, 168 (Ind. 1996)). Under this subtype, a "defendant seeks to prevent a plaintiff from asserting a claim which the plaintiff had previously litigated and lost against another defendant." *Parklane Hosiery*, 439 U.S. at 326 n.4. Here, defensive issue preclusion guides our analysis. Providers met each of its requirements step by step.

**First**, entered plea agreements are final judgments on the merits. *See Virsnieks v. Smith*, 521 F.3d 707, 714 (7th Cir. 2008) (guilty pleas "are accorded a great measure of finality" because they "are important components of this country's criminal justice system") (quoting *Blackledge v. Allison*, 431 U.S. 63, 71 (1977)). Because guilty plea agreements effectively determine "the rights of the parties in the suit," *Watford v. State*, 270 Ind. 262, 265, 384 N.E.2d 1030, 1033 (1979) (internal citation and quotation marks omitted), we assign them the same weight of finality as convictions from trial, provided the plea satisfied the minimum baseline requirement—*i.e.*, it was entered "knowingly, intelligently, and voluntarily." *See Hockett v. Breunig*, 526 N.E.2d 995, 999 (Ind. Ct. App. 1988) (convicted criminal was "precluded from asserting a contrary position" in a malpractice action, when the defendant admitted at the guilty plea hearing that the facts were true and that his plea was "knowingly, intelligently, and voluntarily entered"). And here, Miller's guilty but mentally ill plea, which resulted in the trial court's sentencing order finding him guilty of voluntary manslaughter, constituted a final judgment on the merits. *See Terrell v. State*, 180 Ind. App. 634, 636, 390 N.E.2d 208, 209 (Ind. Ct. App. 1979) ("sentencing is final judgment").

**Second**, the identity of the issues requirement is sufficiently met because Miller "knowingly, intelligently, and voluntarily" admitted to committing voluntary manslaughter, *see Hockett*, 526 N.E.2d at 999, which he then sought to contest on his civil appeal. Voluntary manslaughter is defined as a "person who **knowingly or intentionally** kills another human being . . . while acting under sudden heat[.]" Ind. Code § 35-42-1-3(a); *Carmack v. State*, 200 N.E.3d 452, 459 (Ind. 2023) (emphasis added).

Here, Miller pleaded guilty but mentally ill[2] in his criminal case, but urged on appeal in his civil lawsuit that "[a]n insane person is not held to be responsible for his acts." Appellant's Br. at 12. In essence, his medical malpractice claim turns on the theory that he was **insane** at the time of the killing. But Miller's mens rea was already established by his guilty but mentally ill plea, so he is attempting to relitigate the **same issue** "necessarily adjudicated in the prior proceeding[.]" *National Wine & Spirits*, 976 N.E.2d at 706. We thus find this issue sufficiently identified.

**Finally**, Miller is the "party to be estopped" and "was a party" to the "prior action." *National Wine & Spirits*, 976 N.E.2d at 704. With this final element satisfied, Providers establish the threshold requirements to apply collateral estoppel. What remains in dispute is the application of two relevant considerations: (a) whether Miller enjoyed a full and fair opportunity to litigate his legal responsibility in the context of his guilty but mentally ill plea, and (b) whether imposing collateral estoppel would be otherwise unfair to him. We address each consideration in sequence.

### A. Miller had a full and fair opportunity to litigate his legal responsibility, but he instead chose to enter a guilty but mentally ill plea agreement, and thus waived his opportunity to later challenge his mens rea.

Collateral estoppel applies when the party against whom the judgment is pleaded enjoyed a "full and fair opportunity to litigate" an issue. *National Wine & Spirits*, 976 N.E.2d at 704. The scope of full and fair

---

[2] We pause to acknowledge that a "guilty but mentally ill plea" does **not** imply the defendant is less culpable than a guilty defendant. *See Archer v. State*, 689 N.E.2d 678, 684 (1997) ("The fact that defendant pleaded guilty but mentally ill does not change these fundamental principles."); *see also* I.C. § 35-36-2-5(a) ("[W]henever a defendant is found guilty but mentally ill at the time of the crime or enters a plea to that effect that is accepted by the court, the court shall sentence the defendant in the **same manner** as a defendant found guilty of the offense.") (emphasis added). This Court has emphasized that such a verdict "invokes no special sentencing scheme." *Archer*, 689 N.E.2d at 684 (citing *Gambill v. State*, 675 N.E.2d 668, 676 (Ind. 1996)). Instead, the only "special consideration" given to a guilty but mentally ill defendant, *id.*, is prescribed in Subsection (c), which provides that such a defendant, if committed to the Department of Corrections, "shall be further evaluated and then treated in such a manner as is psychiatrically indicated for his mental illness." I.C. § 35-36-2-5(c).

**opportunity** raises an unanswered question: is this consideration met when defendants enter a guilty plea accepting their criminal liability?

We wade into uncharted waters in Indiana, but we reach safe harbor to conclude for the first time that plea agreements reflect a "full and fair opportunity to litigate," and thus collateral estoppel applies with equal force whether the prior criminal adjudication was based on a jury verdict or guilty plea. Both are simply two sides of the same coin: they each constitute final judgments. *See Terrell*, 180 Ind. App. at 636, 390 N.E.2d at 209. Another image may be helpful: plea agreements and jury trials—both accepted forms of criminal adjudication—represent different **vehicles** for reaching the same final **destination**—here, voluntary manslaughter. That said, while jury trials and plea agreements are separate vehicles, we find any distinction between the two for collateral estoppel purposes unpersuasive. Plea agreements constitute "contracts between the defendant and the State," and therefore principles of contract law "generally apply." *Davis v. State*, 207 N.E.3d 1183, 1186 (Ind. 2023). On a baseline level, plea agreements must satisfy a constitutional minimum for defendants to relinquish their rights knowingly, intelligently, and voluntarily, as the result reflects a "defendant's consent that judgment of conviction may be entered without a trial," and "a **waiver** of his right to trial before a jury or a judge." *Brady v. United States*, 397 U.S. 742, 748 (1970) (emphasis added); *see also Creech v. State*, 887 N.E.2d 73, 74–75 (Ind. 2008) (holding that a defendant can, as part of his plea agreement, waive his right to appeal a sentencing decision). Here, Miller consented to a guilty but mentally ill plea to voluntary manslaughter: the **opportunity** to litigate was given to him; he just **exercised** it differently. And so whether he arrived at his conviction vis-à-vis a guilty plea or jury verdict is beside the point for collateral estoppel. *See Hockett*, 526 N.E.2d at 999.

We also understand the realities of the criminal justice system. Today, "for the most part," the American criminal justice system is "a system of pleas, not a system of trials." *Lafler v. Cooper*, 566 U.S. 156, 170 (2012); *see also Missouri v. Frye*, 566 U.S. 134, 143 (2012) (recognizing "[t]he reality is that plea bargains have become so central to the administration of the criminal justice system"). It is etched deep into the fabric of day-to-day criminal adjudication. Because "horse trading [between prosecutor and

defense counsel] determines who goes to jail and for how long[,]" plea agreements do not constitute some "adjunct" feature of the criminal justice system; they **are** the system. *Frye*, 566 U.S. at 144 (quoting Robert E. Scott & William J. Stuntz, *Plea Bargaining as Contract*, 101 YALE L.J. 1909, 1912 (1992)). This experience is confirmed in Indiana, where the dominant method of criminal adjudication in 2018[3] was overwhelming in comparison: 196,429 guilty plea/admissions compared to 1,239 jury trials.[4]

Plea agreements reflect a calculated cost-benefit assessment of the risk and reward of going to trial. As a general matter, defendants who typically "take their case to trial and lose receive longer sentences[,]" compared to defendants who accept a plea on the front end. *Frye*, 566 U.S. at 144 (quoting Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 STAN. L. REV. 989, 1034 (2006)). And so, a plaintiff, like Miller, cannot profit from his bargain, and then "complain that [he] did not have a fair and full opportunity to litigate" his mens rea when he tactically entered a plea, rather than litigating the issue at trial. *See National Wine & Spirits*, 976 N.E.2d at 708; *see also Davis*, 207 N.E.3d at 1187 ("defendant cannot retain the benefits of [a plea] . . . while escaping its burdens"); Geoffrey C. Hazard Jr., *Revisiting the Second Restatement of Judgments: Issue Preclusion and Related Problems*, 66 CORNELL L. REV. 564, 578 (1981) ("The effrontery, or as some might say it, *chutzpah*, is too much to take.").

The Court of Appeals cited *Talarico v. Dunlap*, 685 N.E.2d 325 (Ill. 1997), to "look behind the curtain" of Miller's plea. *Id.* at 331. *Talarico* stands for the view that collateral estoppel does **not** always apply to guilty pleas and must be assessed case-by-case. *Id.* at 332. In that action, Talarico brought a medical malpractice claim against a physician, Dr. Frank Dunlap, and a clinic, Dixie-Ashland, claiming negligent prescription of Accutane—a medication designed to ameliorate and treat acne—which he argued caused him to commit battery, unlawful restraint, armed violence, and

---

[3] For purposes of this illustration, we are analyzing a pre-COVID-19 year.

[4] *See* Indiana Trial Court Statistics by County (last accessed June 29, 2023), https://public.courts.in.gov/icor/ (filtering method of disposition between guilty pleas/admissions and jury trials for 2018), archived at https://perma.cc/6W69-4QEL.

sexual abuse against two men in a forest preserve. *See id.* at 326–27. There, Talarico stipulated to the facts of his crimes, admitting that he committed them "intentionally and knowingly, without legal justification." *Id.* at 326.

Reviewing Dunlap's motion for summary judgment, the Supreme Court of Illinois affirmed the view that collateral estoppel is a "flexible" equitable doctrine "which defies rigid or mechanical application." *Id.* at 329–30. Since its application could not "be reduced to a simple formula," the Court examined Talarico's "incentive to litigate." *Id.* at 330. Applying the "incentive to litigate" formula, *Talarico* concluded that collateral estoppel was not appropriate. *See id.* at 330–31. Talarico had been originally charged with aggravated battery, aggravated unlawful restraint, armed violence, and aggravated criminal sexual abuse—and sentences for theses convicted offenses would be substantial. *Id.* at 330. But Talarico had accepted a guilty plea for "one-year misdemeanor probation, psychiatric counseling and fees." *Id.* at 331. And at the time of his criminal action, Talarico was a "second-year medical student," and any prison time "would have delayed his studies." *Id.* Moreover, before Talarico's criminal proceedings, Dunlap wrote the Illinois State's Attorney on behalf of Talarico, characterizing him as "intelligent, rational and of a very mild demeanor." *Id.* Finally, Talarico's defense attorney signed an affidavit swearing at the time Talarico signed his guilty plea, his counsel "had neither an indication nor a suspicion of any malpractice on the part of Dunlap." *Id.* Thus, *Talarico* concluded the incentive to litigate was "not fully present," and therefore "collateral estoppel should not apply." *Id.*

The Court of Appeals found *Talarico* especially persuasive. We do not reach the same conclusion. *Talarico* strayed from a tradition upholding the "finality of the judgment, the integrity of the guilty plea, judicial economy, and fairness to defendants[.]" *Id.* at 332 (McMorrow, J., dissenting). Similar to *Talarico,* the Court of Appeals permitted Miller to "maintain contrary legal positions in two different lawsuits," raising the same list of concerns chronicled by the *Talarico* dissent, *id.,* which we embrace today.

Miller enjoyed a full and fair **opportunity** to litigate his now-challenged legal responsibility. For starters, he was never denied his constitutional right to a trial by jury, and his criminal case lasted more than three years,

where discovery was available to him. After making a rationally calculated assessment of the risks of litigating his responsibility at trial, Miller "knowingly and voluntarily" waived his right to one. These facts are undisputed. He also testified under oath that he **fully** understood his constitutional rights and that his plea was freely and voluntarily made. He next conceded that he had the requisite mens rea to commit voluntary manslaughter. And so when he entered his plea agreement, Miller admitted that he "knowingly or intentionally" killed his grandfather in violation of Indiana Code Section 35-42-1-3(a). Because Miller entered this plea agreement, he accepted the factual basis of each element of his crime.

Put another way: Miller deliberately **waived** his opportunity to later assert that his violent conduct was proximately caused by Providers' medical malpractice in their treatment of him. For these reasons, Miller cannot "use the judicial system to have it both ways." *Talarico*, 685 N.E.2d at 332 (McMorrow, J., dissenting). Because guilty pleas and convictions from trial reflect two sides of the same coin, we need not "look behind the curtain of the negotiated guilty plea" to discover whether a defendant, like Miller, had a full and fair opportunity to litigate his responsibility. *Id.* at 331. His plea itself necessarily proved that he did. Thus, provided a defendant's guilty plea was made "knowingly, intelligently, and voluntarily," *see Hockett*, 526 N.E.2d at 999, the plea itself constitutes a full and fair opportunity to litigate for collateral estoppel. Under our approach, we need not look beyond the four corners of a plea agreement.

This conclusion finds support in other states. For example, the Supreme Court, Appellate Division of New York held that courts should not look behind the curtain of valid pleas to relieve defendants of their guilty admissions: "As long as the guilty plea stands, the defendant is guilty and cannot be heard to say otherwise." *Merchants Mut. Ins. Co. v. Arzillo*, 98 A.D.2d 495, 506 (N.Y. App. Div. 1984). In *Adkinson v. Rossi Arms Company*, 659 P.2d 1236 (Alaska 1983), the Supreme Court of Alaska reached a similar conclusion about the preclusive effect of guilty pleas when it rejected a defendant's later ambitious attempt to implead a gun manufacturer in a wrongful death action, when he had been earlier convicted of manslaughter: "[A]llowing a criminal defendant, who has been convicted of an intentional killing, to impose liability on others for

the consequences of his own anti-social conduct runs counter to basic values underlying our criminal justice system." *Id.* at 1239–1240.

Federal courts have reached a similar conclusion about guilty pleas. More than forty years ago, the Fifth Circuit—citing appellate decisions from the Tenth, Eighth, and Third Circuits—applied "the general rule" that "collateral estoppel applies equally whether the prior criminal adjudication was based on a jury verdict or a guilty plea." *Brazzell v. Adams*, 493 F.2d 489, 490 (5th Cir. 1974) (party who had pleaded guilty to selling heroin, but later sought damages from Texas state officials under 42 U.S.C. § 1983 on an entrapment theory). Twenty years later, the Fifth Circuit in *State Farm Fire and Casualty Company v. Fullerton*, 118 F.3d 374 (5th Cir. 1997), reaffirmed that a guilty plea reflects a full and fair opportunity to litigate for collateral estoppel. *Id.* at 381. The Fifth Circuit, applying Texas state law, found that Texas's "more recent decisions tend to favor treating a guilty plea as the equivalent of a conviction after a trial." *Id.* at 381. *Fullerton* acknowledged "little difference" between its state and federal rules of collateral estoppel. *Id.* at 383. In crediting its earlier decision in *Brazzell*, the panel took "comfort in the fact . . . a plea of guilty" should be subject to collateral estoppel. *Id.* Other circuits reinforced the panel's decision. *See, e.g., Fontneau v. United States*, 654 F.2d 8, 10 (1st Cir. 1981) (barring a party who pleaded guilty to federal tax evasion from relitigating the issue of fraud in a later civil proceeding); *Ivers v. United States*, 581 F.2d 1362, 1367 (9th Cir. 1978) ("[W]e must take [defendant's] plea of guilty to be an admission of each and every essential element of the [federal] crime charged, including the element of knowledge and willfulness."); *Nathan v. Tenna Corp.*, 560 F.2d 761, 763 (7th Cir. 1977) (panel finding that plaintiff "is estopped by his guilty plea to federal mail fraud charges from denying that his participation in the commission-splitting scheme involved illegal conduct").

Our state and federal systems share a vigorous interest in preserving the **finality** and integrity of a criminal judgment—guilty plea or otherwise. *See Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("a presumption of finality and legality" attaches to a final criminal judgment). "Without finality, the criminal law is deprived much of its deterrent effect." *Teague v. Lane*, 489 U.S. 288, 309 (1989); *see Calderon v. Thompson*, 523 U.S. 538, 556

(1998) ("To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike.") (internal citation and quotation marks omitted). In the post-conviction context, finality is a cherished virtue. We find many of those same policy concerns militating in favor of defensive collateral estoppel. On a fundamental level, finality is derivative of three "practical considerations," including (1) "the costs of relitigation," (2) "the accuracy of new proceedings," and (3) "the damage to the reputation of the criminal justice system." Ryan W. Scott, *In Defense of the Finality of Criminal Sentences on Collateral Review*, 4 WAKE FOREST J. L. & POL'Y 179, 185 (2014) [hereinafter, *Finality of Criminal Sentences*].

Here, at least two of those sub-interests would be implicated if Miller could relitigate his culpability: **one**, it would levy greater litigation costs on the Hoosier court system as defendants would be encouraged to relitigate their responsibility; and **two**, it would inflict reputational harm on our criminal justice system, inviting "the rancor of the community toward the legal profession and justice system." *Talarico*, 685 N.E.2d at 332 (McMorrow, J., dissenting). We are careful to avoid this collision course because "[w]ithout some visible and conclusive resolution to cases"—without **some** finality—"a system of criminal justice lacks legitimacy." Scott, *Finality of Criminal Sentences* at 187. But legitimacy matters.

It is also undisputed that plea agreements help preserve scarce judicial resources. *See State ex rel. Goldsmith v. Marion Cnty. Super. Ct.*, 275 Ind. 545, 552, 419 N.E.2d 109, 114 (1981) (plea agreements are encouraged because they "facilitate expeditious disposition of criminal cases"); *Pannarale v. State*, 638 N.E.2d 1247, 1248 (Ind. 1994) (pleas "are designed to induce the defendant to plead guilty, typically in return for a promise of less than the maximum sentence"). Pleas also function as substantial cost-saving measures for courts, prosecutors, and defense counsel. *See* Albert W. Alschuler, *Implementing the Criminal Defendant's Right to Trial: Alternatives to the Plea Bargaining System*, 50 U. CHI. L. REV. 931, 946–47 (1983).

We thus hold that guilty pleas, like convictions from trials, represent full and fair opportunities to litigate. To hold otherwise—and allow Miller to maintain opposing legal positions—would undermine finality and

judicial economy, and infuse doubt about the legitimacy of prior adjudications.

## B. Applying collateral estoppel to Miller would not be otherwise unfair because he entered a guilty but mentally ill plea that accepted the factual basis of his mens rea in his voluntary manslaughter conviction.

The final consideration is whether applying collateral estoppel to Miller would be "otherwise unfair" because he entered a guilty but mentally ill plea. *National Wine & Spirits*, 976 N.E.2d at 704. Indiana has not described the meaning of the term "unfair" for purposes of defensive collateral estoppel. Indiana does, however, explain when applying collateral estoppel would be **fair**. For example, *Rimert* found that a "guilty but mentally ill" conviction from trial itself could not provide rescue to a defendant seeking to avoid the wrongful acts doctrine barring a civil action. *See* 680 N.E.2d at 875–76. In *Rimert*, the panel relied on this Court's decision in *Kimberlin v. DeLong*, 637 N.E.2d at 121, for the proposition that a criminal trial, which resulted in a conviction, presented "a sufficient opportunity to litigate disputed issues" in a manner "**entirely fair** to collaterally estop [defendant] from relitigating those issues" in a civil action. *Rimert*, 680 N.E.2d at 876 (emphasis added). Thus, the panel concluded that Rimert's civil battle could not "survive the public policy bar because his mental condition rendered him not fully responsible for the killings." *Id.*

In its assessment of the fairness factor, the Court of Appeals here acknowledged *Pritchett v. Heil*, 756 N.E.2d 561 (Ind. Ct. App. 2001). In *Pritchett*, the plaintiff—a former county jail inmate who had been convicted by a jury for prostitution in connection with sexual acts performed between a jailer and herself—was collaterally estopped from bringing civil claims against the Benton County Sheriff for negligent hiring, supervision, and retention of accused and respondeat superior liability. *Id.* at 563–66. The crime of prostitution is defined, relevant here, as "[a] person . . . who **knowingly or intentionally**: (1) performs, or offers or agrees to perform, sexual intercourse or deviate sexual conduct . . . for money or other property . . . ." I.C. § 35-45-4-2 (emphasis added). The

plaintiff had been found guilty of prostitution by a **jury**. 756 N.E.2d at 564. Thus, when she brought the claim against the Sheriff, she relied on the issue of sexual "consent," which had been "necessarily" established in her criminal trial. *Id.* at 565. *Pritchett* held that, since the plaintiff had a full and fair opportunity to litigate consent, it would be fair to apply estoppel because "[a]s a matter of public policy, it would be ill-conceived to allow a person to benefit from a defense in a civil trial which was expressly rejected on the same issue by a jury in a criminal trial." *Id.* at 565–66.

While Indiana has not defined the meaning of "unfairness," the Seventh Circuit has provided guidance in *Reed v. Illinois*, 808 F.3d 1103 (7th Cir. 2015). In that decision, Judge Posner, writing for the panel, initially acknowledged these amorphous and undefined concepts often "lack precision," but yet concluded they still must be given concrete meaning because "they are elements of legal doctrine." *Id.* at 1108. The panel furnished a rule of thumb: unfairness for defensive collateral estoppel is "to deny, without a good reason, a party's right to press a potentially winning argument." *Id.* This principle emanates from a "desire not to deprive a litigant of an adequate day in court," which might arise where a plaintiff was "laboring under a mental or physical disability that impeded effective litigation." *Id.* (internal citation and quotation marks omitted). In *Reed*, the plaintiff, a pro se litigant in a personal injury suit, failed "to establish the applicability to her case of the federal laws against disability discrimination." *Id.* Based on her acute speech disability, lack of legal representation, and her denied request for help, the majority panel concluded that collateral estoppel could not be fairly extended to Reed. *Id.*

Applying collateral estoppel here would not be unfair for two reasons. **First**, Miller had his day in court; his guilty plea reflects that fact. He made a tactical decision to enter a plea with the rational goal of securing a reduced sentence for his liability. Unlike *Reed*, Miller was represented by an attorney who guided him through the proceedings, *cf.* 808 F.3d at 1108, and facilitated a plea for his client. **Second**, while Miller's mens rea was not decided by a jury, he still accepted the factual basis of his voluntary manslaughter conviction, which included the "knowingly or intentionally" element. Similar to the plaintiff in *Pritchett* who was guilty of "knowingly or intentionally" committing prostitution, Miller's mens

rea was "necessarily" decided when the trial court entered his plea. *See* 756 N.E.2d at 565. Much like *Rimert*, Miller's guilty but mentally ill condition does **not** allow him to duck the wrongful acts doctrine. *See* 680 N.E.2d at 875–76. And so the policy motivation for this doctrine applies with equal gravitas to entered pleas. Under these facts, "the application of collateral estoppel is not unfair." *Kimberlin*, 637 N.E.2d at 125.

In short, a decision not to apply collateral estoppel on fairness grounds here would be "ill-conceived." *Pritchett*, 756 N.E.2d at 566. Miller enjoyed his day in court. Helped by his legal counsel, Miller reasonably weighed the costs and benefits of whether to enter a guilty but mentally ill plea, or press on and challenge his fault at trial. He made a choice, and we honor his decision. Because a conviction from a jury verdict or guilty plea is immaterial under our collateral estoppel analysis, *see Rimert*, 680 N.E.2d at 876 and *Pritchett*, 756 N.E.2d at 565–66, we conclude that collateral estoppel can be fairly applied to Miller. Judge Posner may be correct that unfairness is especially acute when courts "deny, without a good reason, a party's right to press a potentially winning argument[,]" but we have ample good reasons to apply estoppel here. *Cf. Reed*, 808 F.3d at 1108.

## III. Providers satisfactorily carried their summary judgment burden of establishing that Miller's damages are not compensable.

Because we assume without deciding the wrongful acts doctrine applies, Miller is barred from recovering damages that stem, "in whole or in part," from his criminal conduct. *Rimert*, 680 N.E.2d at 871–72. We now turn to the final issue: whether Providers sufficiently carried their summary judgment burden under Indiana Trial Rule 56 of establishing that Miller's damages are not compensable. In his complaint, Miller alleges that, under the negligent care of Providers, he "suffered and will continue to suffer from permanent injuries and disabilities, great pain, emotional distress, mental trauma, and loss of freedom." Appellant's App. Vol. III, pp. 38–44. He also claims he incurred "medical expenses, attorney fees, and [other] expenses." *Id.*

Providers sufficiently carried their summary judgment burden with respect to damages that stem, "in whole or in part," from his criminal conduct. *See Rimert*, 680 N.E.2d at 871–72. Summary judgment is appropriate "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). Under Indiana's summary judgment standard, the initial burden is placed on Providers, as the movants, to "demonstrate[] the absence of any genuine issue of fact as to a determinative issue[.]" *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009) (internal citation and quotation marks omitted). If successful, they are entitled to summary judgment, unless Miller, as the non-movant, steps "forward with contrary evidence showing a triable issue for the trier of fact." *Id.* at 762. Here, both parties assumed that *Rimert* applied. The accepted premise of *Rimert* was therefore enough to satisfy Providers' Trial Rule 56 burden: Miller cannot recover damages flowing from his incarceration and loss of freedom. *See Rimert*, 680 N.E.2d at 874.

The **undisputed** evidence establishes that Miller pleaded guilty but mentally ill to voluntary manslaughter, which established that he "knowingly or intentionally" committed the crime. Here, Miller advances the theory that Providers' alleged negligence proximately caused his loss of freedom and incarceration. This view is reflected in both his complaint and answers to interrogatories. And Miller's appellate brief even **admits** that his claim against Providers is based, at least in part, on his incarceration from his crime. These damages fit squarely within *Rimert*'s universe. *See* 680 N.E.2d at 873 ("Indiana's longstanding and oft-expressed rule of public policy [is] that one should not be permitted to profit from his . . . wrongdoing."). Accordingly, Miller cannot recover these damages.

Miller also alleges damages **before** his criminal act in his complaint. These damages take the form of "mental anguish" and "emotional suffering," which resulted from Providers' alleged failure to properly diagnose and treat Miller's Schizophrenia, which, in turn, caused his mental condition to "deteriorate." Appellant's Br. at 10. While *Rimert* contemplates "complete responsibility" for actions that arise, "in whole or in part," from criminal conduct, 680 N.E.2d at 875, the policy—by its own terms—does not appear to embrace acts **outside** that confined expression.

This understanding was confirmed in *Beal v. Blinn*, 9 N.E.3d 694 (Ind. Ct. App. 2014), where the Court of Appeals distinguished *Rimert* to conclude that a defendant could sue his attorney in civil court for the attorney's own actions. *Id.* at 701. There, the convicted defendant had not relied on his "own criminal conduct in an attempt to shift responsibility for the resulting damages[.]" *Id.* Rather, he structured his claim on the actions of his **attorney** for alleged malpractice. *Id.* This was found distinguishable enough from *Rimert*: applying the wrongful acts doctrine to actions untethered from criminal conduct would not advance the same policy aims to prevent **defendants** from profiting from their **own** criminal conduct. *See Rimert*, 680 N.E.2d at 872 (defendants "who knowingly and intentionally engage in serious illegal acts should not be able to impose liability upon others for the consequences of their own behavior"); *see also Cole v. Taylor*, 301 N.W.2d 766, 768 (Iowa 1981) (to allow recovery would be "plainly . . . wrong as a matter of public policy"). Miller's pre-criminal act damages could be likened to *Beal*, because they might be unconnected enough to Miller killing his grandfather. *See* 9 N.E.3d at 701. But that is a question for another day. While the scope of *Rimert*'s causation requirement—"in whole, or in part"—may be reasonably contested, we need not join that novel debate today because the argument is waived.

On the front end, Miller's motion opposing summary judgment barely, if at all, addresses these damages—apportioning a sentence or two in bereft description; and to the extent these damages are even mentioned, their scant reference lacks any citation to the record or legal authority sufficient to preserve the issue for appeal. *See Young v. Tri-Etch, Inc.*, 773 N.E.2d 298, 299 (Ind. Ct. App. 2002) ("Generally, a party may not raise an issue on appeal which was not raised in the trial court . . . [which] also applies to summary judgment proceedings.") (quoting *Hardiman v. Governmental Interinsurance Exch.*, 588 N.E.2d 1331, 1333 (Ind. Ct. App. 1992), *trans. denied*). But even if these claims were initially preserved for appeal, his appellate brief fails to cogently argue the point. *See Ramsey v. Review Bd. of Indiana Dept. of Workforce Development*, 789 N.E.2d 486, 489–90 (Ind. Ct. App. 2003). At no point in his appellate brief does Miller appear to object to the trial court's decision on this issue, or explain why he is entitled to such damages. But in Indiana, appellate law is fortified by its

established procedural rules: "[a] litigant who fails to support his arguments with appropriate citations to legal authority and record evidence waives those arguments for our review." *Pierce*, 29 N.E.3d at 1267; *see City of Indianapolis v. Buschman*, 988 N.E.2d 791, 795 (Ind. 2013) (finding party's argument waived for failing to meet Rule 46's criterion); Ind. Appellate Rule 46(A)(8) (appellant's brief must support each claim with cogent reasoning, and citations to relevant authorities, statutes, and the record). These rules serve a crucial function.

"The purpose of our appellate rules, Ind. Appellate Rule 46 in particular, is to aid and expedite review and to relieve the appellate court of the burden of searching the record and briefing the case." *Dridi v. Cole Kline LLC*, 172 N.E.3d 361, 364 (Ind. Ct. App. 2021) (quoting *Ramsey*, 789 N.E.2d at 487). We will not step in the shoes of the advocate and fashion arguments on his behalf, "nor will we address arguments" that are "too poorly developed or improperly expressed to be understood." *Id.* (quoting *Terpstra v. Farmers & Merch. Bank*, 483 N.E.2d 749, 754 (Ind. Ct. App. 1985), *trans. denied*). "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research," but instead are tasked with solving disputes "as arbiters of legal questions **presented** and **argued** by the parties before them." *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.) (emphasis added). The Indiana Supreme Court is no such board, nor do we "possess a roving commission to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (Kavanaugh, J.). We do **not** exist to answer every legal question that may exist in the ether; rather, we resolve concrete issues properly tested through the adversarial process: adequate and cogent briefing is required for that process to live up to its potential.

Here, Miller's claims about pre-criminal act damages are insufficiently explained to avoid waiver. On appeal, he cited no legal authority to support an argument for pre-criminal act damages. Nor did he explain the nexus between the actions of Providers and the alleged pre-criminal act damages he allegedly suffered as a result. *See Dridi*, 172 N.E.3d at 364. We thus find any arguments about his pre-criminal act damages waived.

# Conclusion

For these reasons, we affirm the trial court's grant of summary judgment to Providers.

Slaughter and Molter, JJ., concur.
Rush, C.J., concurs in part and dissents in part with separate opinion in which Goff, J. joins.

ATTORNEYS FOR THE APPELLANT
Rhonda L. Wood
Michael W. Phelps
David W. Stewart
Stewart Phelps Wood Injury Lawyers
Indianapolis, Indiana

ATTORNEYS FOR THE APPELLEES
Edna M. Koch
Joseph D. McPike
Erin E. Meyers
Zeigler Cohen & Koch
Indianapolis, Indiana

**Rush, C.J., concurring in part and dissenting in part.**

Two critical points are undisputed: Zachary Miller suffered from severe mental illness in December 2016 and January 2017, and a unanimous medical review panel found the Providers failed to comply with the appropriate standard of care in treating him during this one-month period. A brief review of the Providers' actions during that time contextualizes my decision to write separately.

On December 9, Miller was treated by his primary care physician after his mother became concerned about her son's "odd behaviors," including "hearing voices" and "noises." On his physician's advice, Miller immediately underwent a psychiatric exam that revealed "his symptoms were getting worse," and that he had threatened to strangle his Mother "until her eyes popped out." He was again discharged and told to return if his symptoms worsened. When they did two days later, Miller returned and informed a nurse that "he is here to stay, thinks he needs to stay." But he was once again discharged and told to return if his symptoms worsened. They did five days later, but this time Miller was brought to the hospital by law enforcement after he attacked and threatened to kill his grandfather. The police filed an immediate detention application, and Miller was admitted for evaluation—he stayed for three days and was discharged on December 16.

Then, on January 1, law enforcement again brought Miller to the hospital after he threatened his mother, kicked his grandfather, and killed the family dog. And though officers again filed an immediate detention application, Miller was discharged within hours. One week later, Miller returned to the hospital due to worsening symptoms, including "several days of increased agitation and anxiety" and "hearing voices." Although he wanted to be admitted, Miller was **again** discharged and **again** instructed to return "if symptoms worsen." Less than twenty-four hours later, Miller brutally assaulted his grandfather, resulting in his death.

Miller eventually pleaded guilty but mentally ill to voluntary manslaughter, but evidence from his sentencing hearing reveals a collective understanding that he was under significant psychiatric distress when he committed the offense. Indeed, the trial court explained that

"obviously the mental health issues are a major mitigating factor" and that Miller "acted under strong provocation . . . due to his mental health issues and that he was hearing voices that were telling him to do things." The prosecutor likewise acknowledged the severity of Miller's condition when he addressed Miller and his family, lamenting that "the system has failed him and has failed the citizens of this county in not being able to properly address Zach's issues earlier and prior to the death of his grandfather."

It is thus unsurprising the medical review panel unanimously found that, during the one-month period leading up to his grandfather's death, the Providers failed to comply with the applicable standard of care when treating Miller, and this failure was a "factor of the resultant damages." It is equally unsurprising that Miller then filed a complaint in the trial court, alleging that he incurred damages due to the Providers' negligence. The majority assumes without deciding that the wrongful-acts doctrine, as articulated in *Rimert v. Mortell*, 680 N.E.2d 867 (Ind. Ct. App. 1997), *trans. denied*, applies to Miller's claims, and precludes him from recovering damages that stem in whole or in part from his criminal act. On this record, I agree and thus concur with the majority's holding in that respect. But I write separately on this issue to explain how the wrongful-acts doctrine, as adopted in *Rimert*, is in tension with principles of comparative fault, which are ordinarily utilized in determining and apportioning fault among parties in a negligence action, such as Miller's. And I respectfully dissent from the majority's holding that the Providers are entitled to summary judgment on Miller's claims for damages he sustained before his criminal act.

## I. The wrongful-acts doctrine, as adopted in *Rimert*, is in tension with principles of comparative fault.

In Indiana, a typical tort action is governed by our Comparative Fault Act, which is codified at Indiana Code chapter 34-51-2. This Act requires the factfinder to assess the fault of "all persons who caused or contributed to cause" a plaintiff's alleged damages. Ind. Code §§ 34-51-2-7(b)(1), -8(b)(1). If the plaintiff is partly at fault for their own damages, their recovery is diminished proportionately; but if their contributory fault

exceeds that of the defendant, they are barred from recovery. *Id.* at §§ -5, -6(a).

Contrary to this statutory scheme, the wrongful-acts doctrine effectively extinguishes the possibility that the plaintiff's conduct and the defendant's conduct could each contribute to the plaintiff's alleged damages. That is, the doctrine treats the parties' acts as mutually exclusive, inherently unable to coexist or jointly impact the plaintiff's injury. However, as others have similarly observed, such treatment is in tension with comparative fault principles. *See, e.g., Tug Valley Pharmacy, LLC v. All Plaintiffs Below in Mingo Cnty.*, 235 W. Va. 238, 773 S.E.2d 627, 633–37 (2015); *Dugger v. Arredondo*, 56 Tex. Sup. Ct. J. 1099, 408 S.W.3d 825, 831–33 (2013); *Albert v. Sheeley's Drug Store, Inc.*, 265 A.3d 442, 460–62 (Pa. 2021) (Dougherty, J., dissenting); *Greenwald v. Van Handel*, 311 Conn. 370, 88 A.3d 467, 479–83 (2014) (Eveleigh, J., dissenting); *see also* Joseph H. King, Jr., *Outlaws & Outlier Doctrines: The Serious Misconduct Bar in Tort Law*, 43 Wm. & Mary L. Rev. 1011 (2002).

So, while I concur with the majority's application of the wrongful-acts doctrine here, I am open to examining the tension between the doctrine and the principles of comparative fault in a future case. As the majority observes, the policies undergirding the wrongful-acts doctrine are rooted in prudent interests and concerns. But we must remain cognizant of the extent to which our public policy rules comport with other generally applicable principles of law. In wrongful-act cases, the issues of fault and causation may appear vexing, but the factfinder—not a detached appellate court—is best equipped to assess the diverse array of factors that contribute to their determination and then allocate fault accordingly. *See Green v. Ford Motor Co.*, 942 N.E.2d 791, 794–95 (Ind. 2011).

## II. Miller did not waive his argument contesting the entry of summary judgment on his claims for pre-criminal-act damages, and the Providers are not entitled to summary judgment on those claims.

The majority holds Miller waived appellate review of his claims for damages sustained before his criminal act. I disagree. The Providers did not move for summary judgment on those claims, and Miller has not waived his argument that the trial court erred in granting summary judgment on those claims.

In his complaint, Miller specifically alleged the Providers failed to comply with applicable standards of care and, as a direct and proximate result of their negligence, he incurred expenses and has suffered and will continue to suffer from permanent injuries and disabilities, great pain, emotional distress, and mental trauma. In moving for summary judgment, the Providers had the burden to "demonstrate the absence of any genuine issue of fact as to a determinative issue." *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). It is only after the moving party satisfies this initial burden that it then shifts to the non-movant to come forward with contrary evidence and create a genuine issue of material fact as to the determinative issue raised. *Kramer v. Cath. Charities of Diocese of Fort Wayne–South Bend, Inc.*, 32 N.E.3d 227, 231 (Ind. 2015).

Here, the burden never shifted to Miller on his claims for pre-criminal-act damages because the Providers neither addressed nor introduced **any** evidence regarding those claims. Indeed, the Providers never argued that they were entitled to summary judgment on Miller's claims for pre-criminal-act damages. Rather, they argued only that "there is no genuine issue of material fact that [Miller's] claim for damages is predicated upon a criminal act, for which Plaintiff has been found fully responsible, and is therefore barred as against public policy pursuant to Indiana law."

And a review of this record belies the majority's position that "Miller's motion opposing summary judgment barely, if at all, addresses" his pre-criminal-act damages. *Ante*, at 23. In that motion, Miller specifically argued the Providers "fail[ed] to address other damages he sustained

prior to the incarceration and offense, which includes [his] medical condition and damages throughout his treatment by the [Providers]. Therefore, Summary Judgment cannot be granted on these damages." He also pointed out that the medical review panel considered all of his "treatment and damages . . . including the treatment and damages that are separate from the offense and incarceration." And he maintained he was "not barred from seeking damages" for the Providers' negligence prior to the offense. Miller then reiterated these same arguments when he moved the trial court to reconsider its order granting summary judgment. Simply put, Miller's argument that the Providers are not entitled to summary judgment on his claims for pre-criminal-act damages was twice raised before the trial court and is properly preserved for appeal. *Cf. Dunaway v. Allstate Ins. Co.*, 813 N.E.2d 376, 387–88 (Ind. Ct. App. 2004).

The majority, however, concludes that even if Miller preserved this argument, he waived it on appeal under Appellate Rule 46(A) because "[a]t no point in his appellate brief does Miller appear to object to the trial court's decision on this issue." *Ante*, at 23. As an initial observation, the trial court hardly rendered a "decision on **this** issue." *Id.* (emphasis added). The court's order granting summary judgment contains a single conclusory line of reasoning: "There are no material issues of fact, and the [Providers] are entitled to judgment, in their favor, as a matter of law." Though this conclusion extends to all of Miller's claims, the court did not distinguish between Miller's claims for damages that arose before his offense—for which the Providers did **not** move for summary judgment— and his claims for damages that arose in whole or in part from the offense.

This concern aside, the majority's waiver conclusion is further undercut by a complete review of Miller's appellate brief as he squarely addressed the court's grant of summary judgment on his claims for pre-criminal-act damages. For example, Miller asserted in the argument section that "he is seeking compensation for damages he suffered due to the Providers' failure to diagnose and treat." Appellant's Br. at 13. He reiterated this, noting "the assault of his grandfather is not the only damages" he is seeking. *Id.* at 27. And he later maintained that "[h]e should be allowed to . . . have all of his damages considered." *Id.* at 32.

Yet, the majority's finding of waiver ultimately rests upon yet another "even if" basis. That is, even if Miller preserved his claims about pre-criminal-act damages for appeal (he did), and even if he raised those claims on appeal (he did), they "are insufficiently explained to avoid waiver." *Ante*, at 24. In drawing this conclusion, the majority quotes *Pierce v. State*, 29 N.E.3d 1258, 1267 (Ind. 2015), but there, we recognized our preference to, if possible, "resolve cases on the merits instead of on procedural grounds like waiver," *id.* (quotation omitted). And we explained that "we will address the merits of a claim" unless a party's non-compliance with Rule 46(A) is "sufficiently substantial to impede our consideration of the issue raised." *Id.* (quotation omitted). True to these principles, we considered Pierce's argument even though his appellate brief was "utterly devoid of citations to anything at all" and did not cite any "legal authority in support of his claim of error." *Id.* at 1268. Those same deficiencies are simply not present here, and thus, there is no basis not to address Miller's argument.

Indeed, to the extent Miller did not comply with Rule 46(A), his non-compliance falls far short of being "sufficiently substantial" such that it impedes our consideration of determining whether summary judgment is appropriate on his claims for pre-criminal-act damages. This legal question is plainly before us. All Miller needed to do was direct our attention to the fact the Providers never moved for summary judgment on those claims. And, as indicated above, he did so several times—in the trial court and on appeal. To be sure, Miller could have elaborated on his argument in his appellate brief and cited legal authority in support. But this is plainly not a case where the deficiencies "are so numerous and egregious that we are unable to ascertain his argument." *Martin v. Hunt*, 130 N.E.3d 135, 138 n.1 (Ind. Ct. App. 2019); *see also Dridi v. Cole Kline LLC*, 172 N.E.3d 361, 364 (Ind. Ct. App. 2021) (noting that the brief contained multiple deficiencies and violated nearly every provision of Rule 46(A)); *Picket Fence Prop. Co. v. Davis*, 109 N.E.3d 1021, 1029–30 (Ind. Ct. App. 2018) (same), *trans. denied.*

And, importantly, it is well settled that under our heightened summary judgment standard we err "on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims."

*Hughley*, 15 N.E.3d at 1004. This is particularly true in negligence cases, where "[s]ummary judgment is rarely appropriate." *Kramer*, 32 N.E.3d at 231. By my review, not only has Miller not waived his argument, but it is also meritorious. Miller was the master of his complaint. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987). And, as established above, Miller's complaint included claims for pre-criminal-act damages, and the Providers did not move for summary judgment on those claims. Moreover, Miller's designated evidence reveals that those claims may, in fact, be meritorious. He included professional evaluations regarding the severity of his psychiatric condition at the time he sought care from the Providers, as well as the medical review panel's unanimous finding that—in the month leading up to the criminal act—the Providers "failed to comply with the appropriate standard of care" and that failure "was a factor" of Miller's "damages."

In short, the Providers did not carry their initial burden to show that Miller's pre-criminal-act damages are not compensable; thus, they are not entitled to summary judgment on the entirety of Miller's complaint. *See Converse v. Elkhart Gen. Hosp., Inc.*, 120 N.E.3d 621, 626 (Ind. Ct. App. 2019) (recognizing that "summary judgment must be denied" when "the movant fails in their initial burden"). And Miller has not waived his argument on this issue, as he raised it both before the trial court and on appeal. Further, this is not a case where Miller's noncompliance with Appellate Rule 46(A) is egregious, let alone so substantial as to impede our consideration of the issue. Thus, in my view, finding waiver on this record is antithetical to our role in reviewing summary judgment "to ensure that no party is denied his day in court." *Schoettmer v. Wright*, 992 N.E.2d 702, 706 (Ind. 2013). I therefore respectfully dissent from the Court's decision to affirm the trial court's grant of summary judgment on Miller's claims for pre-criminal-act damages.

Goff, J., joins.